UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AMANDA L. ZETTELMIER,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

CASE NO. C08-5636KLS

ORDER AFFIRMING THE COMMISSIONER'S DECISION TO DENY BENEFITS

Plaintiff, Amanda L. Zettelmier, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits. The parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Rule 13. After reviewing the parties' briefs and the remaining record, the undersigned hereby finds and ORDERS as follows:

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 30 years old.[1] Tr. 25. She has a high school education and past work experience as a certified nursing assistant and fast food worker. Tr. 57, 62, 88.

On December 21, 2004, plaintiff filed applications for disability insurance and SSI benefits,

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

ORDER
Page - 1

alleging disability as of November 25, 2002, due to fibroproliferative diabetic retinopathy, juvenile diabetes, high blood pressure, edema, high cholesterol, asthma, depression, and failing kidney function. Tr. 15, 52-54, 56, 574.  Her applications were denied initially and on reconsideration. Tr. 15, 25-26, 46, 579-80, 584-85.  A hearing was held before an administrative law judge ("ALJ") on July 11, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 593-620.

On September 28, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)      at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2)      at step two, plaintiff had "severe" impairments consisting of obesity, sleep apnea, diabetes, and almost complete loss of vision in the left eye;

(3)      at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)      after step three but before step four, plaintiff had the residual functional capacity to perform a significant range of light work, with certain other non-exertional limitations;

(5)      at step four, plaintiff was not capable of performing her past relevant work; and

(6)      at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 15-24.  Plaintiff's request for review was denied by the Appeals Council on September 11, 2008, making the ALJ's decision the Commissioner's final decision. Tr.5; 20 C.F.R. § 404.981, § 416.1481.

On October 20, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  The administrative record was filed with the Court on January 28, 2009. (Dkt. #12). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

(a)      the ALJ erred in finding plaintiff's depression, kidney impairment and back pain to be not severe, and in ignoring vision problems in her right eye;

(b)      the ALJ erred in evaluating the medical evidence in the record;

(c)      the ALJ erred in assessing plaintiff's credibility; and

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

ORDER
Page - 2

(e) the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

For the reasons set forth below, the undersigned does not agree that the ALJ erred in determining plaintiff to be not disabled, and therefore affirms the ALJ's decision.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I. The ALJ's Step Two Analysis

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 404.1520, § 416.920. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. [§ 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff had severe impairments consisting of obesity, sleep apnea,

diabetes, and almost complete loss ov vision in the left eye. Tr. 16. The ALJ further found in relevant part as follows:

> I has [sic] made an analysis of the claimant's other various reported conditions, including . . . depression, back pain, and "failing" kidney function, etc., but was unable to document sufficient objective medical signs and laboratory findings of a longitudinal nature to justify a finding of a "severe" impairment. For example, although on March 16, 2005, consultative psychiatrist Richard Price, M.D.[,] gave the claimant a GAF of only '45', he also noted that her condition seemed "improved" (and "in partial remission") on Celexa alone, and found the claimant fully able to perform simple and even detailed and complex job tasks, and to interact appropriately with others, adding that with treatment, she would not be limited (at all) by her mental condition (Ex. 6-F). I further note that the claimant's mental status evaluations throughout the record generally find her to be "within normal limits" (Ex. 4-F, pp. 5-7) and although the record was held open following the hearing to allow submission of documentary psychiatric and/or psychological treatment, only a single page letter from Child Protective Services was received (Ex. 20-F). Further, the claimant has referred to her "failing" kidneys at several points, but the record suggests that these were more likely warnings by her treating physicians of what might occur in the future if the young claimant continued to be non-compliant with controlling her blood pressure, blood sugar, and medical advice to exercise, etc. . . . [H]er back pain complaints, which she admits almost "decreased to nothing" after the birth of her child, have produced relatively normal or negative X-ray findings. Therefore, the claimant's . . . depression, back pain, and "failing" kidney function (deficient creatine levels), etc., will be considered "non-severe" for the purposes of this decision . . .

Tr. 16. Plaintiff argues the ALJ erred in not finding her depression, kidney impairment and back pain to be severe. She also argues the ALJ erred in not considering vision symptoms she had with respect to her right eye. For the reasons set forth below, the Court disagrees.

    A.    <u>Depression</u>

In mid-February 2005, Kimberly Wheeler, Ph.D., evaluated plaintiff, diagnosing her with moderate depression, which she found resulted in moderate limitations in her ability to exercise judgment and make decisions and in her ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting. Tr. 165-66. Dr. Wheeler further opined, however, that plaintiff's "[m]oderate level of depressive symptoms" were "fairly well treated" with medications. Tr. 167. Plaintiff was evaluated again in mid-March 2005, by Richard Price, M.D., who diagnosed her with dysthymia by history, a probably recurrent, mild to moderate depressive disorder in partial remission, and a global assessment of functioning ("GAF") score of 45.[3] Tr. 182. Dr. Price also opined in relevant part:

---

[3] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" <u>Pisciotta v. Astrue</u>, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." <u>Id.</u> (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); <u>see also</u>

> It is her physical problems that keep her from being able to work. . . . She should continue on her antidepressant medication. Counseling for her own problems could be very helpful for her. With these services, she may improve significantly within the next 12 months.
>
> . . . The claimant is quite an intelligent young lady and is capable of managing her funds. She is able to perform simple and repetitive tasks and may be able to perform detailed and complex tasks. Her personality is pleasant and she could probably accept instructions from supervisors and interact with co-workers and the public.
>
> With appropriate treatment for her mental condition, she would be able to perform work activities consistently and not be limited by her mental condition. Her physical problems will probably be progressive and will prevent her from being able to maintain employment.

Tr. 182-83.

The record also contains a psychiatric review technique form completed by Janis Lewis, Ph.D., in late March 2005, and affirmed by Thomas Clifford, Ph.D., in late August 2005, in which they diagnosed plaintiff with dysthymia as well, along with borderline personality traits, but found at most she had only mild limitations in her mental functioning. Tr. 187, 194. Drs. Lewis and Clifford also noted that plaintiff's depression was "currently controlled with med[ication]s," that she was "able to perform SRT [simple repetitive or routine tasks] and some detailed/complex ones," that she could both "accept instructions from supervisors" and "interact with coworkers and the public," and that "[a]t this time," her "condition" was "non-severe." Tr. 196.

Plaintiff points to the opinions of Dr. Wheeler and Dr. Price as evidence that her depression was a severe impairment. Defendant argues the ALJ appropriately evaluated their opinions, by noting the fairly unremarkable mental status findings provided in Dr. Wheeler's report (see Tr. 17, 168-70), her conclusion that plaintiff's level of depression was controlled fairly well with medications (see Tr. 17), and Dr. Price's conclusion that with mental health treatment she would not be limited by any mental condition. The Court agrees the ALJ did not err here. First, as just noted, the mental status evaluation performed by Dr. Wheeler was largely normal. See Batson, 359 F.3d at 1195 (ALJ need not accept opinion of evan treating physician if it is inadequately supported by clinical findings).

It is true as pointed out by plaintiff that Dr. Wheeler did indicate she was moderately limited in her ability to exercise judgment and make decisions and in her ability to respond appropriately to and tolerate

---

Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning.").

ORDER
Page - 5

the pressures and expectations of a normal work setting. As noted by both the ALJ and defendant, though, Dr. Wheeler also commented that plaintiff's moderate depressive symptoms were "fairly well treated" with medications. Tr. 167. While these two opinions may be somewhat contradictory, given the lack of clinical findings to support the existence of significant mental health symptoms in Dr. Wheeler's evaluation report, and the fact that it is the sole duty of the ALJ to resolve ambiguities and conflicts in the medical evidence in the record, the Court finds no error on the ALJ's part here.

As for Dr. Price, it also is true as noted above that a GAF score of 45 indicates serious symptoms or a serious impairment in social or occupational functioning, and that a GAF score is "relevant evidence" of a claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). The ALJ properly noted, however, that despite assessing this low GAF score, Dr. Price found it was plaintiff's "physical problems," not her mental condition, that kept her from being able to work, and that medication has been beneficial to her to the extent that he considered her mild to moderate depression to be in at least partial remission. See Tr. 179-80, 182. Indeed, also as noted by the ALJ, the functional assessment that Dr. Price gave essentially included no significant limitations. See Tr. 183.

B.  Kidney Impairment

Plaintiff argues the rationale the ALJ gave for finding her kidney impairment to be non-severe was factually inaccurate. Plaintiff points to laboratory findings documenting the existence of chronic kidney disease, and to her own testimony that she suffers from leg edema, which is worse when she is on her feet, and which she asserts is a common symptom of that disease. In regard to this last assertion, no evidence is in the record establishing this to be a medical fact of which the Court may take judicial notice. In addition, just because a claimant may have a medical impairment, this alone is not sufficient to establish severity at step two, let alone demonstrate disability. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability").

At step two of the disability evaluation process, furthermore, while an ALJ must take into account a claimant's pain and other symptoms (see 20 C.F.R. § 404.1529), the severity determination is made solely on the basis of the objective medical evidence in the record:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical

evaluation process itself.  <u>At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.</u>  If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed.  Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA [substantial gainful activity].

SSR 85-28, 1985 WL 56856 *4 (emphasis added).  Here, although the record does show plaintiff has been diagnosed with edema at times, the objective medical evidence contained therein further shows her edema was not always present and, more importantly, did not result in any significant functional limitations. See Tr. 201, 211-13, 258, 308, 351, 395, 401, 451, 461-62, 464-69, 471-72, 474-77, 481, 483, 485, 490, 493, 496, 501, 503, 546, 549, 570.  Further, while Mark Heilbrunn, M.D., found edema during his evaluation of plaintiff conducted in early August, 2005, he did not attribute any of the functional limitations he found to that condition or to any kidney impairment. See Tr. 420, 422-23.

     C.    <u>Back Pain</u>

Plaintiff relies on Dr. Heilbrunn's evaluation report to argue the ALJ's determination that her back pain constituted a non-severe impairment was erroneous.  Specifically, she argues the ALJ did not take into account Dr. Heilbrunn's opinion that her back pain interfered with her ability to sit and stand for sustained periods of time.  Defendant argues Dr. Heilbrunn's functional assessment was appropriately rejected due to it being inconsistent with his own objective findings.  The undersigned agrees.  Dr. Heilbrunn provided an assessment of plaintiff's functional capabilities, which reads in relevant part:

> . . . She has a moderate postural range of motion limitation of limited back anterior flexion but normal extension and lateral flexion.  She has no other postural range of motion limitations.
>
> The claimant has no manipulative range of motion limitations of either arm or hand and has the ability to use her upper extremities for all work related activities with the exception of moderately decreased firm grasping with the right.  Firm grasping on the left is normal.  She is able to accomplish fine and dextrous movements, feeling, manipulating and overhead reaching.
>
> Based on the physical examination findings, the claimant could be expected to sit for a cumulative length of time off [sic] 5-6 hours with periods for postural repositioning, correlating to non[-]radiating lumbar degenerative joint disease.
>
> She could be expected to stand or walk for at least 10 minutes uninterrupted as manifested in the examination, and for a cumulative length of time of 4-5 hours in an eight-hour workday with limitations correlating to lumbar degenerative joint disease, obesity and increasing shortness of breath with low levels of activity.
>
> The claimant is able to lift at least 10 pounds with either hand and carry this weight for a short distance.

There is not [sic] medical necessity for an assistive device. . . .

Tr. 422-23. The record shows, however, that the examination performed by Dr. Heilbrunn failed to reveal much in the way of significant physical functional symptoms or limitations. See Tr. 419-22.

The existence of discrepancies between a medical opinion source's functional assessment and that source's clinical notes, recorded observations and other comments concerning a claimant's capabilities constitutes "a clear and convincing reason for not relying" on the assessment. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); see also Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989); Batson, 359 F.3d at 1195 (ALJ need not accept opinion of even treating physician if it is inadequately supported by clinical findings). The ALJ specifically noted the above discrepancy between Dr. Heilbrunn's assessment and his own objective findings. Tr. 20. Also as noted by the ALJ, plaintiff told Dr. Heilbrunn that after her pregnancy in 2003, "her back pain had decreased to 'almost nothing.'" Tr. 418. Plaintiff did go on to state that she then "developed increasing low back pain" with an increase in weight. Id. Nevertheless, the ALJ's first stated reason for rejecting Dr. Heilbrunn's identified limitations, and therefore his determination that plaintiff did not have a severe impairment, was proper.

D.  Vision Limitations

As noted above, the ALJ found plaintiff had a severe impairment consisting of "almost complete loss of vision in the left eye." Tr. 16. As a result of that impairment, the ALJ also found plaintiff could not perform tasks requiring binocular vision. Tr. 19, 23. Plaintiff argues, though, that the ALJ erred by failing to consider vision symptoms she had with respect to her right eye. Specifically, she points to her own testimony at the hearing that while her vision in her right eye was "pretty good," she still had trouble with "some reading," testifying further that:

> . . . I can't be on a computer for very long. It puts a huge strain on my eyes and everything gets real blurry and unfocused. I drive, but only during the day. At night, or at night or if it's raining I will not drive because I cannot focus and I cannot -- I have a very bad depth perception, so it makes it more difficult if it's raining or if it's dark. If it's sunny out, I have to wear protective sunglasses, otherwise the light is too bright and it blinds me to where I can't see.

Tr. 605. As noted above, though, the severity determination at step two is made solely on the basis of the objective medical evidence in the record.

That evidence, furthermore, fails to reveal the presence of any significant symptoms connected

ORDER
Page - 8

with plaintiff's right eye vision. In mid-to-late October 2003, examinations revealed the existence of diabetic retinopathy in both eyes. Tr. 263-64. In late October 2003, plaintiff's oppthalmologist, Mark R. Corley, M.D., wrote a letter, in which he stated as follows:

> Amanda Zettelmier is at present visually impaired due to her significant diabetic retinopathy. She is in the process of receiving laser treatment to both eyes for this condition. Her laser treatments will require several more sessions, and her vision may not be stable for four to six months. It will not hurt the eyes to use them during this time, but poor vision will limit her abilities. Hopefully her eventual vision will be stable and improved.

Tr. 155. In early November 2003, another physician, Anthony R. Truxal, M.D., also wrote a letter, stating that due to the "severe complications" of her diabetic eye disease, plaintiff now was "legally blind in both eyes." Tr. 441. In late October 2004, Dr. Truxal stated that plaintiff was "stable despite asymmetric vision with 20/40 acuity in her right eye and 20/200 acuity in her left eye" post treatment. Tr. 149.

In early August 2005, plaintiff was examined by Dr. Heilbrunn, who also found that she had 20/40 vision in her right eye "[w]ith lenses." Tr. 420. Dr. Heilbrunn further found "[h]er corrective visual acuity" was "moderately decreased on the right and severely decreased on the left," such that she was "only able to discern light or dark," which he felt might constitute "a visual workplace limitation," although later he stated there were no "corrected visual" limitations. Tr. 423. Dr. Heilbrunn, however, did not assign any specific work place limitations to the moderate decreased vision he found in her right eye. Nor is there any indication in the record that the general visual limitations found by Dr. Corley prior to treatment continued thereafter, and indeed the medical evidence appears to show, at least with respect to the right eye, that they did not. As such, no error by the ALJ is found here.

II.     The ALJ's Evaluation of the Medical Evidence in the Reocord

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

ORDER
Page - 9

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A. Dr. Heilbrunn

As just discussed, Dr. Heilbrunn examined plaintiff in early August 2005, finding significant visual limitations in her left eye. Also as discussed above, the other clinical findings Dr. Heilbrunn's examination produced were fairly unremarkable. Specifically, that examination revealed she "had no difficulty with maneuvering within the examination room, that she "was able to accomplish all ranges of

motion," and that she could "mount and dismount the examination table without assistance." Tr. 419-20. Her gait was normal, as was her station, bilateral hand coordination, heel-toe standing and leg balance. Tr. 420. While plaintiff did have some lumbar and right shoulder tenderness, her left shoulder, elbow, wrist, knee and ankle joints, legs and arms were all normal. Tr. 421. Hip rotation was full and pain free, motor strength was full, sensation was intact, and there was no muscle atrophy. Id.

Dr. Heilbrunn diagnosed plaintiff with lumbar degenerative joint disease without radiculopathy, obesity, hypertension, and a history of: diabetes, retinopathy with decreased visual acuity, greater on the left, and asthma. Tr. 422. As noted above, in terms of ability to function, Dr. Heilbrunn found in relevant part that plaintiff had "decreased firm grasping" in his right hand, could "sit for a cumulative length of time off [sic] 5-6 hours with periods for postural repositioning," could stand "for a cumulative length of time of 4-5 hours in an eight-hour workday," and was "able to lift at least 10 pounds with either hand and carry this weight for a short distance." Tr. 422-23. The ALJ stated that because Dr. Heilbrunn observed plaintiff to be "fully neurologically intact" and to have other normal objective clinical findings, and because plaintiff "herself acknowledged that her back pain had decreased to almost nothing" at the time, he was according "significant weight to the State Agency medical opinions that" plaintiff "would be able to lift and carry 20 lbs. occasionally and 10 lbs. frequently rather than only 10 lbs., and stand, walk, and sit for 6 hours each in an 8-hour workday, rather than for 5-6 and 4-6 hours respectively." Tr. 20, 171-78.

Plaintiff argues the ALJ's reasons for rejecting Dr. Heilbrunn's more restrictive limitations were not valid, given that the non-examining state agency physicians upon whose opinions the ALJ relied, did not perform any tests in addition to those conducted by Dr. Heilbrunn that would call the latter's findings into question. Plaintiff also argues those findings are not contradicted by any other treating or examining physician opinion. The undersigned disagrees. First, discrepancies between Dr. Heilbrunn's functional assessment and his clinical findings "is a clear and convincing reason for not relying" on that assessment. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); see also Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989); Batson, 359 F.3d at 1195 (ALJ need not accept opinion of even treating physician if that opinion is inadequately supported by clinical findings). While, as discussed above, plaintiff did report an increase in her low back pain at the time Dr. Heilbrunn examined her, the first reason the ALJ provided for rejecting Dr. Heilbrunn's physical functional limitations is still valid. Tr. 418; see Bayliss, 427 F.3d 1216;

Weetman, 877 F.2d at 23.

Second, as noted above, a non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Lester, 81 F.3d at 830-31; Tonapetyan, 242 F.3d at 1149. The opinions of the non-examining state agency physicians on which the ALJ relied to reject Dr. Heilbrunn's assessed functional limitations (see Tr. 171-78) are consistent with such other evidence in the record in this case. For example, plaintiff's treating physician, Chandar Bhimani, M.D., found little in the way of back or extremity impairments or limitations. See Tr. 199 (left rib tenderness due to left-sided chest contusion), 201 (only mild right wrist tenderness, with no decrease in range of motion), 461-62 (back pain reported), 464 (same), 466 (same), 468 (same), 471 (no joint pain or swelling noted), 474 (same), 476 (same), 481 (same), 483 (same), 485 (same), 490 (same), 493 (same), 496 (same), 501 (same), 503 (intact sensation and full motor strength in all extremities), 508 (back, shoulders, hips, station, gait, and upper and lower extremities all within normal limits), 512 (same), 519 (same, except for some decrease in back range of motion).

Other medical evidence in the record indicates similarly unremarkable objective findings regarding physical limitations. See Tr. 252-53 (right ankle tenderness and swelling due to acute strain), 255 (x-ray study showing soft-tissue swelling, but no fractures or dislocations), 256 (right flank pain, low back strain), 258 (mid-right back tenderness and flank pain due to low back strain), 262 (negative right wrist x-ray), 283 (active range of motion within normal limits), 299 (normal gait and normal strength and sensation in all extremities), 332 (no back or extremity tenderness), 350 (neck and back pain denied), 367 (some mild diffuse left hip tenderness due to contusion, but neurovascularly intact and normal gait), 376-77 (some mild mid-left calf tenderness due to contusion, but no tenderness in back), 378 (negative left tibia-fibula electrodiagnostic study), 381 (no back tenderness), 400-01 (full motor strength), 424 (radiographically normal lumbosacral spine), 444 (extremities, sensation, motor strength, and tendon function all intact), 454 (normal neck range of movements, but with tenderness and some right-sided pain), 458 (back pain), 470 (negative lumbosacral spine electrodiagnostic study), 570 (normal gait).

B. Dr. Wheeler

As discussed above, Kimberly Wheeler, Ph.D., performed a psychological evaluation of plaintiff in mid-February 2005, diagnosing her with moderate depression, resulting in moderate limitations in her

ability to exercise judgment and make decisions and in her ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting. Tr. 165-66. Also as discussed above, Dr. Wheeler opined that plaintiff's "[m]oderate level of depressive symptoms" were "fairly well treated" on medication, even though she further opined that mental health intervention was not likely to restore plaintiff's ability to work for pay in a regular and predictable manner. Tr. 167.

Plaintiff argues the ALJ neither rejected the above moderate limitations Dr. Wheeler found, nor did he incorporate them into his assessment of plaintiff's residual functional capacity. However, as discussed above, the ALJ properly found plaintiff's depression to be a non-severe impairment. Thus, while the ALJ did not state expressly that he was rejecting those limitations, his non-severity determination necessarily indicates he felt any limitations plaintiff had stemming from her depression were mild at most. Magallanes, 881 F.2d at 755, (court may draw specific and legitimate inferences from ALJ's opinion). The ALJ noted as well Dr. Wheeler's observation that plaintiff's depressive symptoms had been "fairly well treated" on medication, which also is indicative of the ALJ's rejection the above two moderate limitations. Tr. 17. The undersigned therefore disagrees that the ALJ erred here.

III.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample, 694 F.2d at 642. The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen, 80 F.3d at 1284. The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility in part because of "what treating physicians have referred to as a 'long history of non-compliance.'" Tr. 20. The failure to assert a good reason for not following a prescribed course of, treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Plaintiff argues that while she was non-compliant with recommended treatment for her diabetes prior to her alleged onset date of disability, she became compliant therewith in 2003, after she became pregnant. In addition, plaintiff points to a an eight-month period in 2004, when she did not have any health insurance and could not afford to get medical treatment.

The record, however, shows that in addition to being non-compliant prior to her pregnancy (see Tr. 215-16, 220, 314-15, 319, 326, 357, 394), plaintiff continued to remain so thereafter (Tr. 118, 204, 207-08, 213-14, 465, 467, 469, 472, 475-76, 481, 483, 485, 490, 493-94, 496, 501). Indeed, it specifically was noted in mid-July 2003, that her pregnancy "was complicated" by her non-compliance. Tr. 118. It is true that plaintiff has reported lacking the financial wherewithal to comply with medication treatment at times (see Tr. 205, 220, 391; Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995) (benefits may not be denied due to failure to obtain treatment because of inability to afford it)), but this was so only in regard to some of the reports of non-compliance contained in the record and cited to above.

The ALJ next discounted plaintiff's credibility in part because her allegations of "severe mental symptoms" were "not confirmed by progress or treatment notes." Tr. 20. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). While the record reveals that plaintiff has been diagnosed with depression, the objective medical evidence fails to show the existence of severe mental health symptoms as noted by the ALJ. See Tr. 165-66, 546. For example, the mental status examination performed by Dr. Wheeler in mid-February 2005, was largely unremarkable, and she noted at most only moderate mental functional limitations. Tr. 165-66, 168-70.

1   As noted above, Dr. Price conducted an psychiatric evaluation of plaintiff in mid-March 2005. At
2   the time, plaintiff reported that "she was able to be very functional until her pregnancy." Tr. 179. Plaintiff
3   also reported that medication benefitted her, by making her feel "less anxious and better able to control her
4   temper," with "better self control." Tr. 179-80; see also Morgan v. Commissioner of Social Sec. Admin.,
5   169 F.3d 595, 599 (9th Cir. 1999) (credibility may be discounted based on medical improvement); Tidwell
6   v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). Also as noted above, Dr. Price opined that it was plaintiff's
7   "physical problems" that kept her from working, and that treatment could "significantly" improve her
8   symptoms, such that she "would be able to perform work activities consistently and not be limited by her
9   mental condition." Tr. 182-83.

10  A psychiatric review technique form completed by Janis Lewis, Ph.D., in late March 2005, and
11  affirmed by Thomas Clifford, Ph.D., in late August 2005, found at most only mild limitations in plaintiff's
12  mental functional capabilities, opining that she was capable of performing work activities to the extent that
13  her mental health condition was non-severe. Tr. 194, 196. In early August 2004, Dr. Bhimani, plaintiff's
14  treating physician, diagnosed her with depression, but did not note any mental functional limitations
15  related thereto, nor did plaintiff report any at the time. Tr. 205. Dr. Bhimani completed a physical
16  evaluation form in late September 2005, in which he indicated plaintiff's depression moderately limited –
17  i.e., significantly interfered with – her ability to perform basic work activities for a period of six months, if
18  she did not have medical treatment. Tr. 520-21.

19  Again, however, as noted by the ALJ, nothing in Dr. Bhimani's treatment or progress notes support
20  his finding of significant interference in performing basic work activities, nor does the finding itself satisfy
21  the durational requirement for establishing disability.[4] See Batson, 359 F.3d at 1195; Tackett v. Apfel, 180
22  F.3d 1094, 1098 (9th Cir. 1999) (claimant must suffer from medically determinable impairment that can be
23  expected to last for continuous period of not less than twelve months). Indeed, Dr. Bhimani noted in late
24  March 2007, that plaintiff's depression was "fairly controlled" on medication, and her mood was described
25  as being "normal". Tr. 462, 465. It continued to be normal in early April 2007. Tr. 461. Thus, this too was
26  a valid reason for the ALJ to discount plaintiff's credibility.

27
28      [4]The undersigned further notes that Dr. Bhimani completed two more of these evaluation forms – one in late March 2006
    (Tr. 511-14), and another in late September 2006 (Tr. 507-10) – in neither of which was depression listed as a diagnosis, let alone
    any work-related limitations stemming therefrom.

The ALJ also discounted plaintiff's credibility on the basis that she had "not engaged in structured and ongoing psychiatric or psychological treatment other than a psychotropic medication." Tr. 20. The failure to assert a good reason for not seeking treatment "can cast doubt on the sincerity of the claimant's pain testimony." Fair, 885 F.2d at 603; see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (upholding ALJ discounting claimant's credibility in part due to lack of consistent treatment, and noting that fact that claimant's pain was not sufficiently severe to motivate her to seek treatment, even if she had sought some treatment, was powerful evidence regarding extent to which she was in pain); Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe, and claimant's failure to request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only to be suggestive of lower level of pain and functional limitation).

Plaintiff argues the ALJ's assertion that she did not receive mental health treatment is not factually correct, given that she was taking prescribed medication and was receiving weekly counseling services, and that other than taking medication and pursuing counseling, it is unclear what additional treatment the ALJ would have required her to obtain. The undersigned agrees. As the ALJ himself acknowledged, the record shows plaintiff did take medication for her mental condition, which, as discussed above, benefitted her. See Tr. 419, 443, 453, 458, 461-62, 464-66, 468, 471, 474, 476, 481, 483, 485, 490, 493, 496, 501, 523, 545, 549, 569. Plaintiff also testified at the hearing that she was receiving counseling once a week at her home. Tr. 608. Although there do not appear to be any actual progress or treatment notes concerning such visits in the record, as noted above, plaintiff was at the very least taking prescribed medication for her condition, and the ALJ has provided no explanation as to why such treatment alone was inadequate. This reason for discounting plaintiff's credibility, therefore, was not legitimate.

Lastly, the ALJ discounted plaintiff's credibility for the following reasons:

> In a February 14, 2005 function report, the claimant acknowledged that she remained fully able despite her impairments to take care of her 19 month-old daughter and husband; she can perform all household chores such as cooking, vacuuming, doing the dishes, grocery shopping – although the latter task may take her up to 4 hours to complete, and she can also take care of 2 pet cats.

Tr. 20. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to

1 spend a substantial part of his or her day performing household chores or other activities that are

2 transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be

3 eligible for disability benefits, however, and "many home activities may not be easily transferable to a

4 work environment." Id.

5 Plaintiff argues the ALJ erred here, by failing to address the level of activities of daily living she

6 engaged in, or evidence in the record that she could perform those activities for only short periods of time.

7 The undersigned agrees the record fails to definitively show plaintiff engaged in the above daily activities

8 at a level necessarily indicative of an ability to work. See Tr. 68-70, 77-80, 181, 419, 607. Thus, the ALJ

9 erred in relying on these activities to discount plaintiff's credibility. Nevertheless, although not all of the

10 reasons the ALJ provided for discounting plaintiff's credibility were valid, at least two of them were

11 indeed legitimate. The fact, therefore, that one or more of those reasons were improper does not render the

12 ALJ's credibility determination invalid here, as that determination is supported by the substantial evidence

13 in the record overall. Tonapetyan, 242 F.3d at 1148.

14 IV.     The ALJ's Step Five Analysis

15 If a disability determination "cannot be made on the basis of medical factors alone at step three of

16 the sequential disability evaluation process," the ALJ must identify the claimant's "functional limitations

17 and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996

18 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four of that

19 evaluation process to determine whether he or she can do his or her past relevant work, and at step five to

20 determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or

21 her limitations." Id.

22 A claimant's residual functional capacity is the maximum amount of work the claimant is able to

23 perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work

24 must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only

25 those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a

26 claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

27 related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

28 medical or other evidence." Id. at *7.

In this case, the ALJ found plaintiff had the residual functional capacity to perform a significant range of light work, with the additional non-exertional limitations that she "should not perform job tasks requiring climbing ladders or scaffolding, working near hazards such as unprotected heights or around hazardous, moving machinery, or environmental irritants or toxins." Tr. 19. As discussed above, the ALJ also found that "[b]ecause of her left eye limitations," plaintiff could not perform tasks requiring binocular vision. Id. At the hearing, the ALJ posed a hypothetical question to the vocational expert, containing substantially the same limitations as those included in the above RFC assessment. Tr. 616. In response to that question, the vocational expert testified that there was one other job, fast food worker, plaintiff could perform. Tr. 616-17. Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. Tr. 22-23.

If a claimant cannot perform his or her past relevant work, at step five of the sequential disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett, 80 F.3d at 1098-99; 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Plaintiff argues the ALJ erred in finding her capable of performing other jobs existing in significant numbers in the national economy. Specifically, plaintiff asserts the ALJ omitted the physical limitations identified by Dr. Heilbrunn and the mental limitations found by Dr. Wheeler. In addition, plaintiff asserts the ALJ erred by not including in the hypothetical question he posed to the vocational expert, the

limitation that she needed to rest and those stemming from her "bad days." (Dkt. #13, p. 19). As discussed above, the ALJ did not err in rejecting the limitations identified by Dr. Heilbrunn in favor of those noted by the state agency non-examining consulting physicians. Because, also as discussed above, the ALJ overall properly discounted plaintiff's credibility, he was not required to include the limitations she testified to concerning her "bad days" and need to rest, particularly considering that there is a lack of objective medical evidence in the record to support those alleged limitations. Nor did the ALJ err in excluding from the hypothetical question the two moderate mental functional limitations found by Dr. Wheeler, since, again as discussed above, the ALJ properly discounted her opinion regarding plaintiff's depression.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ properly determined plaintiff was not disabled. Accordingly, the ALJ's decision hereby is AFFIRMED.

DATED this 27th day of July, 2009.

Karen L. Strombom
United States Magistrate Judge